Good morning, Your Honors. May it please the Court, my name is Nicholas Granath and I'm here representing Ms. Loralie Musolf, an individual who is present in the courtroom today. Your Honors, we're on appeal here from retaliation and reprisal claims brought under Title VII in the Minnesota Human Rights Act after the District Court entered summary judgment in favor of the employer. I'm going to start by saying the U.S. Supreme Court recently, in a decision called Tolan v. Cotton, 572 blank, May 5, 2014, overturned a summary judgment ruling after coming to the conclusion, a, quote, inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed to properly acknowledge key evidence offered by the party opposing that motion, end quote. And therefore, that, quote, the Fifth Circuit failed to adhere to the axiom in the ruling on a motion for summary judgment that the evidence of the non-movement is to be believed and all justifiable inferences are to be drawn in his favor, end quote. And they cite Anderson v. Liberty. And I know that the court is very familiar and I don't mean to lecture the court on the law, but it's a point to start our appeal here because we have the same problem on this case. We're here for the same problem. The lower court did not credit our evidence and especially weighed the credibility of conflicting testimony, diametrically conflicting testimony. That was indeed crucial to the case and as well as crucial to the argument that the employer made for the reasons for the termination. That's the Waddell declaration versus the Waddell deposition testimony. And this is critical on the issue of retaliation and reprisal because as the court knows, there are three elements to that. One, adverse action and causal connection. And the district court found only causal connection lacking in our case. But we did indeed provide ample factual support that a jury could rely upon to conclude for the plaintiff, Ms. Musolf. Here's what I think may be a fine but important point here is that not so much that, well, let me put it this way. Your client had explanations for things that JCPenney said were reasons for their action. But whether she's right about why she did things like removing documents or she was joking about going into the manager's office, that kind of thing. The question really is whether JCPenney's managers and decision makers could reasonably believe or in good faith believe that it wasn't a joke or that she did take documents that were not hers and were confidential documents. So what do you have to show that their decision was not only based on false information but was not good faith belief that what she was doing was wrong? The astounding thing, Your Honor, is that we presented a declaration by the person that the company relied upon that said not only was every single reason given inaccurate, but that she had been pressured to lie, no less, on pain of her job. That was the Waddell declaration. And Ms. Waddell, when she testified, affirmed that she voluntarily gave that declaration. And in that context of her being pressured, that followed immediately upon the alleged harasser or perpetrator, if you will, Mr. Picarna. He provided a false and retaliatory complaint to the terminating super manager, Mr. Childs. And that was on August 13th, and within weeks, my client was terminated after a successful career that had otherwise been going basically uphill, not just with JCPenney's but with other employers. Are you saying that Picarna's complaint was itself discrimination? I'm sorry, Your Honor, I didn't quite get your question. Was Picarna's complaint itself some form of discrimination, what he did? He was, or? What we're saying is that the harasser, Mr. Picarna, his complaint was false. It was seized upon as a pretext to subject my client, in the wake of just a few months ago, complaining, which it's undisputed, about unwanted touchings. And that that was a pretext to subject her to heightened scrutiny to the level that she went straight to termination within a few weeks later. And this is all documented. This is what's the amazing thing. If you look in this record, and this is what I really urge the panel to do, because this is a case that I can't tell you, you know, here's the exact point where it all tipped. It's a typical retaliatory circumstance where they didn't leave signposts and messages, but the actions speak loudest for the word, louder than any words. The scenario here is that in January, there were unwanted touchings. There's no dispute about that, multiple ones. Ms. Musolf made complaints, and this was about the same individual that the same terminating manager had asked her to monitor for the same conduct with other women in the workforce. And then Mr. Picarna bided his time for a couple of months, and he seized upon an argument or an altercation or what have you to make a false complaint against my client in writing, which was then seized upon by Mr. Child, the manager, who then embellished the complaint and went straight into a termination-type interview in which my client answered all the questions that she could. And in that interview that led to her termination, and it's not a coaching. It was an interview, according to their terms, that had the potential termination. My client was subject to criticisms for her interaction with the person she just complained about. And this person, Mr. Picarna, that she complained about, she had nonstop questions about what was the status of her complaint, and those were never met. There was a factual dispute here that JCPenney says that they sat down with my client in February. Absolutely not. There's no support in the record for that. Our evidence in the record was that that never happened. And all the way until she was marched out the door, my client is asking the terminating manager in HR, what about this complaint that I have against this person? And this is all documented in the record. And two days after the false complaint by Mr. Picarna, there's an August 18th meeting that she is subject to a barrage of criticisms, most of which have never been made before, which include that she's not interacting properly with a harasser. And after that, this very interview is two and a half hour unprecedented interview, and this is with a person who's almost a star performer here, if the record bears out. There's no dispute about her performance. This interview is closed with a threat of termination all of a sudden. And Mr. Child, the manager of Child, is already recommending termination at this point. Sixteen days later, she's on suspension. Twenty-two days later, she's terminated. And in the interim, for causation of evidence again, Mr. Child approaches Charlene Waddell, the declaration that the lower court simply dismissed, even though it goes all our way, and induced her and pressured her to spy and report on behalf of Mr. Child. And this is not just something that Ms. Waddell says. It's not just something that was told to my client. This is also corroborated by another declaration that the district court simply ignored, and that's by Jessica Binkley. Sir? You said the district court ignored. How did the district court resolve that issue about Ms. Waddell's having been pressured? I don't see any resolution at all. I'm sorry, I don't. I have eminent respect for the court. The district court discussed it, but on page 22, but anyway, go on. Well, at any rate, she weighs it if she does anything, and my whole point to this panel is that's the jury's job. This was a classic credibility conflict, and not of somebody who was tangential, but this is key. The employer's determination is absolutely wrong if Ms. Waddell's declaration is believed, but more than that, it's causation evidence, because it followed immediately upon the unreasonable crediting of the Harrisers, Picarna's, written complaint. This, Mr. Child, the terminating manager, documents. And so the court was wrong again on this point, and I don't know why, but she says that they didn't rely on Picarna's complaint. It's documented by J.C. Penney's that they did. Does Title VII protect against complaints from coworkers as opposed to supervisors? I think that I would answer Your Honor's question with this. The actions of Manager Child should be imputed from the supervisor, Picarna, because he endorsed Picarna, he knew there were complaints against Picarna, not just from my client, but from other women in the store. He unreasonably credited this false complaint against my client. He embellished it, and he unreasonably discounted all of her explanation. So that should be imputed to Manager Child. And then Ms. Child, Ms. Waddell, is informing on Ms. Waddell, Ms. Boozoff, my client, only days later. She reports that Ms. Waddell is preparing to quit. She's still disraught. Your time's expired. Oh, I'm sorry, sir. You're just going through the facts, which we can look at. Did you have any other points you want to make? A whole bunch, but I don't think I have time. I would just say to the Court that nobody should be subjected to having their career terminated because they opposed unreasonable belief in illegal practice, and that's what happened in this case. And the Court weighed evidence. It weighed and discounted a classic credibility conflict. And Ms. Boozoff deserves her day in front of a jury. Thank you, Your Honors. Thank you. Ms. Kays, good morning. Good morning, Your Honor. Let's see. May I disrupt your argument by asking this rather simple question? What went wrong between this apparently very talented employee and her employer? Well, Your Honor, we don't deny that Ms. Meesoff was very talented at her job in terms of making apprehensions and doing other things. But her job involved more than simply stopping shoplifters. It required her to interact with her team of other loss prevention officers appropriately, as well as other supervisors and managers in the store, and to just show other employees of the company the common respect and courtesy that we believe that all our employees are due. In other words, was her personality such that it created a demoralizing effect upon the other employees? It seemed to, Your Honor. Contrary to Mr. Grant's argument, there were other complaints leading up to this meeting in August of 2010. Management had received complaints from loss prevention officers. I believe it's pronounced Alama, who was no longer there, sent a long and detailed e-mail about the difficulty in working with Ms. Meesoff. Also, Ms. Waddell, who appears in numerous instances in this case, had sent an e-mail just days before the meeting complaining about her own difficulties in working with Ms. Meesoff prior to this August 18th meeting. So Mr. Bacarna's complaint was certainly not the only one, and it is receiving about Ms. Meesoff from her own direct reports. If I can address the Waddell issue just for a moment, since that's already come up, I think one of the things . . . I think the district judge resolves this issue about whether there is, in fact, a conflict that creates any sort of fact issue with regard to Ms. Waddell's declaration versus her prior statements to JCPenney Management and with regard to her subsequent deposition testimony. I think the important thing to remember here is at the time of the events in question, the information that JCPenney has upon which to make its employment decision is only the information that Ms. Waddell provided to them about Ms. Meesoff's activities both before and after the August 18th meeting. So at the time that JCPenney is making its employment decision, all it knows from Ms. Waddell is that she's seen Ms. Meesoff take documents, that Ms. Meesoff has solicited her aid to sneak into the store manager's office, and the other matters . . . the difficulty that she has in working with Ms. Meesoff and so forth. So these other factors do not play a role in any decision maker's actions with regard to the termination of her employment or her suspension a week prior to that. With regard to both the retaliation and the reprisal claims, it's important to remember that it is always Ms. Meesoff's burden to show the discriminatory intent regardless of any burden shifting, regardless of anything else. That remains her burden in this case from the get-go. And really nothing in her evidence and nothing in her briefing really even tries to make that connection. She tries to rely merely on the fact that seven months prior to this, that this happened. And what the evidence really shows is that the sole cause of her termination was her string of prohibited conduct that flows from this August 18th meeting. It's not her complaints about Mr. Bacarna. Those complaints were taken seriously and promptly and effectively resolved. And we know this because Ms. Meesoff herself admits that there was never, other than these two days' worth of time, there was never another instance where Mr. Bacarna touched her. She never made any other complaints about it. That incident was over. What seems to be her complaint now is that she disagrees with the employment decision made with regard to Mr. Bacarna. That she believed that because he had done this, that there was no opportunity for coaching, there was no opportunity for rehabilitation, that the only proper decision that J.C. Penney could make was that he be terminated. And because she didn't get the result that she wanted, she keeps asking about it. That doesn't necessarily mean that J.C. Penney hasn't acted appropriately. The trial court also granted summary judgment on her sexual harassment claims, and those have not been appealed here. Also, there's no evidence that J.C. Penney harbored any continuing retaliatory animus toward Ms. Meesoff because of her report of Mr. Bacarna. Immediately after she reported these incidents, she received a positive review. Now, with regard to Ms. Meesoff's positive reviews, she is receiving positive reviews about her job in stopping shoplifting and theft in the stores, but those reviews do contain coaching to improve her interaction with her team and other employees. She also, in May of 2010, received a pay raise. With regard to the evidence that was presented and considered by the district court in granting the summary judgment, appellant makes a great deal of complaint about what they did or didn't consider or how the court treated that evidence. First of all, it's important to remember that it's only the job of the district court to consider evidence in a light most favorable to the non-movement when there is a dispute as to that evidence. Here, there's no dispute. Really, what Ms. Meesoff's complaint is in this court is that she's been hung with her own rope. The diary entries that go on that they entered as evidence confirm every reason that J.C. Penney gave for terminating Ms. Meesoff. She may say that a different spin should be put on those diary entries, the spin that she wants, but the facts that form the basis of J.C. Penney's decision to terminate are undisputed by Ms. Meesoff. For example, she does not dispute that she interviewed her associates immediately after that meeting. The associates then complained and characterized that as retaliatory with regard to the complaints they had previously made against her. She is questioned about that by the store manager, Mr. Child. She does not dispute that she decided to pick and choose between the questions he asked her as to which she would answer. She does not dispute that she refused to answer questions. As the Eighth Circuit has held many times, the Eighth Circuit has made the decision not to act as a super personnel department in deciding whether she should have or shouldn't have answered those questions, whether she should have been asked those questions or not by her managers. But she doesn't dispute this. She also doesn't dispute that she took documents. There is a lot of discussion about whether those documents were confidential or not confidential. J.C. Penney's own policies, which Ms. Meesoff was charged in many cases with enforcing, make it clear that all non-public documents are confidential. It's also undisputed that she showed Ms. Waddell notes from the meeting between her manager and his assistant and herself, which certainly there's a good chance that those are confidential or would be considered such by the company, and Ms. Meesoff would know this. And then finally, there is also no dispute that she tried to enlist Ms. Waddell to access the store manager's office to remove additional documents and that Ms. Waddell refused. She wants to characterize that as a joke, but that is still the information that J.C. Penney had in its possession at the time it made the decision to terminate her. As a result, the information that she offered was not in any way discounted. Instead, the court gave complete credence even to her own diary entries, which is far more than a jury would be required to do. And as a result, the only decision that the court could come to, either under the Title VII standard of but for, for retaliation, or under a mixed motive standard under the Minnesota Human Rights Act, was that there was no evidence linking in any way her complaints in January and February to the ultimate decision to terminate her in January of 2010. And as a result, we request that this court affirm the decision of the district court. Okay. Thank you, Ms. Mays. Granted, you've used up your time. Do you have any new point that you want to address that you have not addressed either in your briefs or . . . You know the answer to that, Your Honor, but if I could have ten seconds. Okay. I'll give you ten seconds. Here's my ten seconds. Everything that she said is not disputed. That is not borne out by the record. Our brief documents with precision, unlike their briefs, the record, in a careful and thorough read, will show that forth. Thank you, Your Honors. Thank you. Thank you, both of you, for your arguments today and also your briefs, and we will take your case under advisement and be back as soon as we can.